*This opinion is subject to revision before final*
*publication in the Pacific Reporter*

**2020 UT 28**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

COUGAR CANYON LOAN, LLC,
*Appellee,*

*v.*

THE CYPRESS FUND, LLC; CYPRESS MANAGEMENT, LLC; OLYMPUS
CAPITAL ALLIANCE, LLC; CYPRESS CAPITAL III, LLC; ROBERT N.
BAXTER; and BLAIR M. WALKER,
*Appellants.*

No. 20180502
Heard March 9, 2020
Filed May 18, 2020

On Direct Appeal

Third District, Salt Lake
The Honorable Robert P. Faust
No. 130907106

Attorneys:

Jefferson W. Gross, S. Ian Hiatt, Salt Lake City, for appellee

Troy L. Booher, Dick J. Baldwin, Salt Lake City, for appellants

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE PETERSEN, JUDGE
CHRISTIANSEN FORSTER, and JUDGE HAGEN joined.

Having recused themselves, JUSTICES HIMONAS and PEARCE do not
participate herein; COURT OF APPEALS JUDGES MICHELE M.
CHRISTIANSEN FORSTER and DIANA HAGEN sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1    Cypress Fund, LLC asks us to declare, as a matter of public
policy, that Cougar Canyon Loan, LLC cannot foreclose on Cypress's

cause of action for legal malpractice. In a separate case, Cougar Canyon obtained a $4 million judgment against Cypress. Believing this judgment resulted from its former legal counsel's malpractice, Cypress filed a malpractice suit against that counsel. But Cougar Canyon—in its effort to collect on its $4 million judgment against Cypress—foreclosed on Cypress's right to bring the malpractice claim. On appeal, Cypress argues that public policy requires us to undo this foreclosure. Because the policy concerns raised by Cypress are insufficient to override the plain language of rules 64 and 64E of the Utah Rules of Civil Procedure (the rules governing the foreclosure of legal claims through a writ of execution), we decline to do so.[1]

## Background

¶2   In an underlying lawsuit, Cougar Canyon obtained a $4 million judgment against Cypress. After losing its appeal, Cypress (and other related parties)[2] sued Jones, Waldo, Holbrook & McDonough, P.C., the law firm that represented it in the underlying lawsuit, for malpractice. At some point after filing this lawsuit, each Cypress party assigned a 99 percent interest in its malpractice claims to JWHM Claims, an entity of which each Cypress party is a member.

¶3   While Cypress appealed the judgment in the underlying suit and initiated its malpractice claim against Jones Waldo, Cougar Canyon attempted to collect on its $4 million judgment against Cypress. As part of its collection efforts, Cypress has foreclosed on homes and asserted alter ego claims in a separate proceeding. Cougar Canyon alleges it has managed to collect "only a fraction of its judgment" through these collection efforts. After attempting to collect from Cypress's assets for more than a year, Cougar Canyon applied for writs of execution on Cypress's legal malpractice action against Jones Waldo.

---

[1] Cypress also asks us to determine whether a denial of a motion to quash is a final, appealable order. Because it is unnecessary to answer this question to resolve the merits of this case, and because it would be unwise to do so without the benefit of adversarial briefing, we decline to answer this question.

[2] The other Cypress parties include Cypress Management, LLC; Olympus Capital Alliance, LLC; Cypress Capital III, LLC; Robert N. Baxter; and Blair M. Walker. Except where it is otherwise appropriate, we refer to the Cypress parties collectively as Cypress.

¶4 Cypress opposed Cougar Canyon's writs of execution by filing a motion to quash. In its motion, Cypress argued that the writs of execution should be cancelled because the malpractice claims had been assigned to another party and because public policy dictated that the claims be exempt from involuntary execution.

¶5 After holding a hearing on the writs of execution, the district court determined that our decision in *Snow, Nuffer, Engstrom & Drake v. Tanasse*[3] subjected legal malpractice causes of action to execution. Accordingly, the district court held that Cougar Canyon was not prohibited from executing on and purchasing Cypress's legal malpractice claim against Jones Waldo. Because each Cypress party had transferred a 99 percent interest in their malpractice claim to JWHM Claims, Cougar Canyon was able to execute only on each party's remaining 1 percent interest.

¶6 Following the district court's order denying Cypress's motion to quash the writs of execution, Cypress filed a notice of appeal. Shortly thereafter, and fearing that the denial of its motion to quash did not constitute a final appealable order, Cypress petitioned for interlocutory appeal. We consolidated both appeals into this case. We have jurisdiction pursuant to Utah Code section 78A-3-102(3).

**Standard of Review**

¶7 We must decide whether, under Utah law, a party who obtained a judgment allegedly because of opposing counsel's malpractice should be permitted to foreclose on the opposing party's resulting legal malpractice claim. This is a question of law, which we review for correctness.[4]

**Analysis**

¶8 Cypress argues that, as a matter of public policy, we should prohibit a "party who benefits from opposing counsel's malpractice" from executing "on the resulting legal malpractice action." Because none of the policy concerns raised by Cypress justifies a departure from the plain language of rules 64 and 64E of the Utah Rules of Civil Procedure—the procedural rules governing writs of execution—we decline to do so.

---

[3] 1999 UT 49, 980 P.2d 208.

[4] *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 1999 UT 49, ¶ 7, 980 P.2d 208.

¶9    Cypress also asks us to determine whether a denial of a motion to quash is a final, appealable order. Because it is unnecessary to answer this question to resolve the merits of this case, and because it would be unwise to do so without the benefit of adversarial briefing, we decline to do so.

## I. The Malpractice Claim is Subject to Execution in This Case

¶10  According to Cypress, we should prohibit, as a matter of public policy, a "party who benefits from opposing counsel's malpractice" from "foreclos[ing] on the resulting legal malpractice action." In Cypress's view, three public policies support this categorical prohibition: (1) a policy against allowing "a double windfall recovery," (2) a policy in favor of ascertaining an appropriate value of clients' malpractice claims against their former lawyers, and (3) a policy in favor of providing clients a fair trial on the merits of their malpractice claims. We reject Cypress's argument in this case because, under rules 64 and 64E of the Utah Rules of Civil Procedure, legal malpractice claims may be "acquired by a creditor through attachment and execution,"[5] and none of the policies identified by Cypress justifies a departure from these rules in this case.

¶11  Rule 64E of the Utah Rules of Civil Procedure governs writs of execution. Under that rule, a party may use a writ of execution "to seize *property* in the possession or under the control of the defendant following entry of a final judgment . . . requiring . . . the payment of money." And rule 64 defines the property subject to execution to include "real and personal property, tangible and intangible property, the right to property whether due or to become due, and an obligation of a third person to perform for the defendant."[6] We have interpreted this language to include legal malpractice claims.[7]

---

[5] *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 1999 UT 49, ¶ 9, 980 P.2d 208.

[6] UTAH R. CIV. P. 64(a)(9).

[7] *Tanasse*, 1999 UT 49, ¶ 9; *see Bagford v. Ephraim City*, 904 P.2d 1095, 1098 (Utah 1995) ("[I]ntangible property, such as choses in action, patent rights, franchises, charters or any other form of contract, are within the scope of [eminent domain] . . . as fully as land or other tangible property." (second and third alterations in original) (citation omitted)). Although the procedural rules have been amended since we issued our decision in *Tanasse*, "choses in action remain 'amenable

(Continued)

¶12 Because the property subject to execution under our rules of procedure includes all causes of action, the legal malpractice claim in this case is subject to execution. And the policy concerns identified by Cypress provide insufficient justification to ignore or amend those rules in this case.

¶13 Although Utah's constitution confers on this court primary authority over the adoption of "rules of procedure and evidence" (subject to amendment by the legislature only "upon a vote of two-thirds of all members of both houses"),[8] we have explained that "an appeal to this court is not the appropriate means to amend a court rule."[9] Rather, when interpreting a rule of procedure on appeal, "it is [our] duty and practice . . . to adhere to the plain language of a rule."[10] In other words, "[w]hen interpreting procedural rules, we use our general rules of statutory construction."[11]

¶14 And under our general rules of statutory construction, public policy considerations are rarely[12] sufficient to override the plain language of the governing text.[13] Instead, a court should consider

---

to execution' under the Utah Rules of Civil Procedure." *Lamoreaux v. Black Diamond Holdings, LLC*, 2013 UT App 32, ¶¶ 13, 15–16, 296 P.3d 780 (citation omitted).

[8] UTAH CONST. art. VIII, § 4.

[9] *St. Jeor v. Kerr Corp.*, 2015 UT 49, ¶ 13 n.5, 353 P.3d 137.

[10] *Id.* ¶ 12.

[11] *Clark v. Archer*, 2010 UT 57, ¶ 9, 242 P.3d 758.

[12] We qualify this statement with the inclusion of the word "rarely" in light of our decision in *Tanasse*. In that case, we overrode the requirements of a procedural rule only because doing so was necessary to fulfill our constitutionally-imposed responsibility to regulate the activities of lawyers. *See infra* ¶ 19.

[13] *St. Jeor*, 2015 UT 49, ¶ 13 ("And while Kerr may disagree with the rule's underlying policies, asking this court to rewrite the rule on the fly is not the appropriate means to advocate for a policy shift. 'Litigants ought to be able to rely on our constructions of our rules and statutes, particularly on matters as critical as the timing standards for filing deadlines.' It would be fundamentally unfair for this court to alter course *post hoc* and foreclose Ms. St. Jeor's suit simply because Kerr disagrees with the outcome of the rule. We therefore decline Kerr's request to 'look to the spirit of the rules' rather than the text

(Continued)

public policy only where it is clarifying the meaning of an ambiguous statute or rule or where it is shaping "a subject lodged firmly within the court's sphere, like the common law."[14]

¶15  So even where an appellant presents compelling reasons "for a policy shift" that is not currently supported by the plain language of our rules of procedure, we do not "rewrite the rule on the fly."[15] Rather, we refer the issue to the appropriate rules committee for additional study, and, if appropriate, we amend the language of the relevant rule through our normal rule-making process.[16] Accordingly, we conclude that Cypress's policy arguments do not warrant setting aside Cougar Canyon's execution of Cypress's malpractice claim.

¶16 Although Cypress raises three policy concerns that may warrant further consideration by our rules committee, Cypress makes no attempt to argue that its position is supported by the language of our rules of civil procedure. Instead, Cypress cites our opinion in *Tanasse* to argue that we should enact a new exception to the general rule that "a legal malpractice claim, like any other chose in action, may ordinarily be acquired by a creditor through attachment and execution."[17] But our decision in *Tanasse* does not justify a departure from the plain language of rules 64 and 64E.

---

itself, and we will not read additional limitations into rule 4(b) that the language cannot bear." (footnotes omitted) (citation omitted)).

[14] *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 20, 143 P.3d 283 ("Typically, courts cede authority over matters of policy to the political branches of government."); *see also Fordham v. Oldroyd*, 2007 UT 74, ¶ 5, 171 P.3d 411 (explaining that a "court's pronouncements of public policy are vulnerable to the legislature's revision or outright rejection").

[15] *St. Jeor*, 2015 UT 49, ¶ 13.

[16] *Id.* ("It would be fundamentally unfair for this court to alter course *post hoc* and foreclose [a party's] suit simply because [the other party] disagrees with the outcome of the rule.").

[17] 1999 UT 49, ¶ 9. Cypress also supports its argument by pointing to cases in other jurisdictions in which courts have prohibited the assignment of legal malpractice claims. Although the cases Cypress cites represent a majority approach, we explicitly rejected that approach in *Eagle Mountain City v. Parsons Kinghorn & Harris, P.C.*, 2017 UT 31, ¶ 18, 408 P.3d 322 ("We reject this invitation to make such

(Continued)

¶17 In *Tanasse*, we prohibited lawyers from purchasing legal malpractice claims against themselves.[18] Our authority to create such a prohibition stemmed from our "plenary authority to govern the practice of law."[19] "This authority includes the power to determine what constitutes the practice of law and to promulgate rules to control and regulate that practice."[20] In contrast to our general rule-making authority, which is partly shared with the legislature, our authority to govern the practice of law by those who are licensed in Utah is exclusive[21] and absolute.[22]

¶18 It was under the aegis of this exclusive and absolute authority to regulate a lawyer's practice of law that we considered the policy

---

a categorical prohibition."). Although the issue in *Eagle Mountain* was whether legal malpractice claims could be *voluntarily* assigned, we noted that we had "already recognized that the *involuntary* assignment of these claims . . . [did] not violate public policy." *Id.* ¶ 16. Instead, we follow the minority approach that determines the assignability of legal malpractice claims by interpreting the plain language of a relevant rule or statute. *See, e.g.*, *Bergen v. F/V St. Patrick*, 686 F. Supp. 786, 787 (D. Alaska 1988) (explaining that a claim was assignable based on the statutory definition of "personal property," which includes "things in action"); *Villanueva v. First Am. Title Ins. Co.*, 740 S.E.2d 108, 110 (Ga. 2013) ("The legislative enactment of a statute is a conclusive expression of public policy, and the Georgia legislature, by its enactment of OCGA §§ 44–12–22 and 44–12–24, has deemed the assignment of a chose in action arising out of contract or involving a right of property to be within the public policy of Georgia, prohibiting only the assignment of a right of action for personal torts or for injuries arising from fraud." (citation omitted)).

[18] *See Tanasse*, 1999 UT 49, ¶ 19.

[19] *Rose v. Office of Prof'l Conduct*, 2017 UT 50, ¶ 60, 424 P.3d 134 (internal quotation marks omitted); *see also Barnard v. Utah State Bar*, 804 P.2d 526, 528 (Utah 1991) (describing the authority over the practice of law as an "inherent power of the judiciary from the beginning").

[20] *Utah State Bar v. Summerhayes & Hayden, Public Adjusters*, 905 P.2d 867, 870 (Utah 1995).

[21] *Id.*

[22] *Rose*, 2017 UT 50, ¶ 69.

concerns presented in *Tanasse*.[23] As part of that decision, we explained that a lawyer's "actions—in forcing an execution sale of [a former client]'s assets to satisfy a default judgment, purchasing [the former client]'s pending legal malpractice claim against [the lawyer], and extinguishing that claim through a motion to dismiss—violate[d] public policy."[24] And because allowing a lawyer to violate public policy in this way would damage "both the legal profession and the legal process as a whole," we exercised our absolute authority over the practice of law to prohibit lawyers from so acting.[25] So our *Tanasse* decision demonstrates that we may use our authority to govern the practice of law to regulate the activities of lawyers—because it is "a subject lodged firmly within the court's sphere"[26]—even where doing so would conflict with a generally applicable rule of civil procedure.

¶19   But the reasoning underlying our decision in *Tanasse* does not justify the creation of an exception to our rules of civil procedure in this case. In contrast to our decision in *Tanasse*—which relied on our constitutional authority to govern the practice of law—here we would not be restricting the activities of a lawyer, but of Cougar Canyon, a non-lawyer business entity.

¶20   Unlike the lawyers whose activity we regulated in *Tanasse*, Cougar Canyon did not swear an oath to serve as "an officer of the courts of this State" or to be subject to the "ultimate authority"[27] over the legal profession that is vested in the courts. Instead, Cougar Canyon is subject only to the rules of civil procedure—the rules upon which Cougar Canyon relied when it made the decision to foreclose upon Cypress's malpractice claim. So, contrary to Cypress's argument, our reasoning in *Tanasse* does not provide the justification needed to set aside Cougar Canyon's execution on Cypress's malpractice claim.

¶21   In sum, under rules 64 and 64E of the Utah Rules of Civil Procedure, a party may execute on a legal malpractice claim. Although Cypress raises a number of policy concerns that are implicated by this rule as it is applied here, we conclude the appropriate avenue for addressing those concerns would be through

---

[23] 1999 UT 49, ¶ 12.

[24] *Id.*

[25] *Id.* ¶ 16.

[26] *Yazd*, 2006 UT 47, ¶ 20.

[27] UTAH R. CIV. P. Preamble: A Lawyer's Responsibilities.

our normal rule-making process. For this reason, we decline to depart from the clear language of our rules in this case. Accordingly, we affirm.

## II. We Decline to Decide the Jurisdictional Issue Raised by Cypress

¶22 Additionally, Cypress invites us to determine whether the denial of a motion to quash constitutes a final, appealable order. Cypress argues that a denial of a motion to quash qualifies as a final order because, once a motion to quash is denied, "the court has finally disposed of the subject matter of the controversy." But we decline to reach this issue because it is unnecessary to our decision and we do not have the benefit of adversarial briefing.

¶23 Usually we are not free to avoid answering questions regarding our jurisdiction. But, as both parties concede, we have jurisdiction to hear this appeal regardless of how we answer Cypress's jurisdictional question. This is because even were we to determine that the denial of Cypress's motion to quash did not constitute a final, appealable order, we would nevertheless have jurisdiction because Cypress also petitioned for interlocutory review. So it is unnecessary to determine whether the denial of Cypress's motion to quash was sufficient to trigger appellate jurisdiction.

¶24 And without the benefit of adversarial briefing it would be unwise to answer that question. This is because it is unclear how our final judgment rule, and case law explaining that rule, would apply in the post-judgment setting.

¶25 A primary policy underlying our final judgment rule is a desire to avoid piecemeal appeals in a single case. Accordingly, through our rules of procedure and case law we have created a number of standards for determining when a piecemeal appeal would be unlikely. For example, rule 54(b) of the Utah Rules of Civil Procedure allows district courts to certify certain orders as final, appealable orders where they are unlikely to be affected by the resolution of other pending claims in the case. And rule 58A of the Utah Rules of Civil Procedure requires district courts to clearly identify final judgments in "a separate document ordinarily titled 'Judgment'—or, as appropriate, 'Decree.'" These rules help to clearly signal to appellate courts whether a particular case is likely to be resolved in a single appeal rather than in piecemeal fashion. But no such mechanisms exist for orders issued post-judgment.

¶26 After judgment has been entered, the district court retains ongoing, limited jurisdiction to facilitate the collection of the judgment. Although it is possible that the parties will never file any

motions or pleadings requiring court action during the post-judgment stage, it is also possible that the parties could continue litigating as fiercely as they had pre-judgment. In this latter scenario, a court may be asked to decide dozens of motions—either all at once or one at a time. This creates a strong possibility of piecemeal appeals.

¶27 In fact, this case provides a good example of how piecemeal appeals could arise post-judgment. This appeal stems from the district court's June 14, 2018 order denying Cypress's motion to quash a writ of execution. Since the court entered that order, the parties have filed a number of motions and statements of discovery issues. Any of these filings could potentially lead to another appeal. So this case illustrates the potential for piecemeal appeals in the post-judgment setting were we to hold that any order denying a motion to quash constituted a final, appealable order. For this reason, a more specific rule for post-judgment orders may be necessary to further the policies underlying our final judgment rule in the post-judgment context.

¶28 Accordingly, we decline to answer the jurisdictional question posed by Cypress. Instead, we will wait to resolve the issue until it is necessary to resolving the merits of a case and we have the benefit of adversarial briefing.

## Conclusion

¶29 Because the plain language of our rules of civil procedure allowed Cougar Canyon to execute on Cypress's legal malpractice claim, and because any change to those rules should be sought through our normal rule-making process, we affirm the district court's denial of Cypress's motion to quash the writ of execution.

————————